**Opinion issued February 22, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-23-00498-CR**

————————————

**GILBERT DAMIAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 412th Judicial District Court**
**Brazoria County, Texas**
**Trial Court Case No. 92897-CR**

---

**MEMORANDUM OPINION**

A jury convicted Appellant Gilbert Damian of the second-degree felony of aggravated assault by threat with a deadly weapon—a knife,[1] and after finding three enhancements true, assessed his punishment at thirty years in prison. In a

---

[1] *See* TEX. PENAL CODE § 22.02(a)(2).

single issue, Damian argues the evidence is insufficient to support his conviction because the "State failed to establish he possessed the requisite *mens rea* for the offense and that he threatened harm to the complainant" with a deadly weapon.

We hold there was sufficient evidence to support the conviction. We affirm the trial court's judgment.

## Background

On May 6, 2021, Yvette Miller called 9-1-1 asking for an officer to come to her residence at 16 North Avenue B in Freeport, Texas. She told the 9-1-1 operator:

> This guy over here is messing with me, he won't leave me alone. I have been begging him all day to please leave me alone. He's been screaming and yelling at me, he hit me, he spit on me, now he's throwing my clothes down the stairs telling me to get out or he's going to throw my dogs out the window. I can't take this.

The police arrived and separately interviewed Damian and Miller. Damian denied assaulting Miller. Miller told the police that Damian hit her in the mouth, pushed her arm, and pulled her leg. She and Damian had been in a relationship and were living together at the house. They fought, Miller told them, because "he thinks I'm messing with the guy next door." She told the police Damian pointed a pocketknife at her and told her he would cut her throat and the other person's throat. An officer took photos of injuries to Miller's lip, shoulder, hand, and face.

2

Damian was arrested and indicted for aggravated assault by threat with a deadly weapon. The indictment alleged that Damian "did then and there intentionally or knowingly threaten Yvette Miller with imminent bodily injury and did use or exhibit a deadly weapon, namely, a knife, which in the manner of its use or intended use was capable of causing death or serious bodily injury." Damian pleaded not guilty.

### The Trial

Damian represented himself during trial.[2] The State presented three witnesses and Damian testified on his own behalf.

#### A. Yvette Miller

Yvette Miller testified that she lived at 16 North Avenue B in Freeport, Texas on May 6, 2021. She and Damian were living there "in a relationship."[3] Before they lived there, they "stayed at a church for a few months" in Freeport, Texas.

According to Miller, on May 5, 2021, she and Damian "were having some drinks and getting along and everything at first. And then I don't know. He just

---

[2] Damian had standby counsel, but Damian opted not to confer with standby counsel during the trial.

[3] According to Miller, about two months before the May 6, 2021 incident, both she and Damian were arrested for assault. Damian was arrested for assaulting Miller, and Miller was arrested for assaulting Damian. Miller testified that she and Damian had an argument and he pushed her. Damian called the police and told them Miller assaulted him, which she denied during her testimony in the present trial. The charges against Damian and Miller were dismissed.

3

started getting, like, mean and belligerent and I kept asking him please stop." He called her "a bitch, a cunt, a slut." Damian called her those names because "[h]e always thought I was messing with the people that lived at the front of the house."[4] He accused her of sleeping with "all the men that were staying" at the house.

Miller testified that eventually that night, Damian became physical. "He just kept yelling at me at first and then I kept telling him just stop, . . . so it didn't go any further. And then that's when he was pulling me on my arm and then he had kicked me on my leg and then he was spitting on me." Damian spit in her face three times and he also "pulled a knife out and said that he was going to cut me and the owner [of the house] if we didn't stop messing around."

Miller called 9-1-1 when she saw "he wasn't going to stop and it was just progressing and I started getting scared." She testified, "[I]t was just getting out of control. He just kept getting more physical and just getting out of control and I just—I just wanted it to stop." Miller testified that Damian "kept telling [her] he was going to throw [her dogs] out the window." She said he tried to pick one up but she grabbed the dog from him.

According to Miller, Damian pulled the knife out of his pocket and opened it. He "always had [the knife] on him." She testified he pointed the knife at her, inches away from her, and told her "he was going to cut me and the landlord."

---

[4] Miller testified they lived in the back unit of a house that had been converted to apartments. Their unit had a bathroom, kitchen, bed, and closet.

Asked how she got a cut on her hand, Miller said, "That's whenever he was coming towards me and I went to grab and it got me right there." Miller also testified that Damian punched her in the face, breaking her tooth, causing her to bleed and "bust[ing]" her lip, slapped her in the face, punched her in the shoulder, and kicked her leg.

After she called 9-1-1, the Freeport Police Department arrived. She told them what Damian did to her and they took photos of her injuries. When the police arrived, Miller's clothes were strewn on the stairs, where Damian had thrown them.

The jury listened to the 9-1-1 call and viewed seven photos the police took of Miller. The photos of her face reflected a broken tooth and a "busted" lip. Miller testified that both happened when he punched her in the face. The jury also saw photos of a cut[5] on her hand, a red mark on her face where Damian allegedly slapped her, and of bruising where he allegedly punched her on her shoulder.

Damian's pocketknife was also admitted into evidence as State's Exhibit 15.[6] Miller testified the knife was the same one Damian put in his pocket after he threatened her with it.

---

[5]     It is unclear from the record whether the cut was from the knife. Miller testified the cut occurred "whenever he was coming towards me and I went to grab and it got me right there."

[6]     Damian, who did not object to the admission of the knife, acknowledged the knife was his.

After Damian was arrested, he released his wallet and bank cards to Miller and told her to use the money in his bank account to pay the rent. The State introduced six letters written by Damian to Miller. In the letters, Damian tells Miller to use the bank cards to pay the rent. He also told her to go to the courthouse to fill out an affidavit of non-prosecution, and that if she failed to do so, he would file charges against her for using the bank cards he previously told her to use.[7]

## B.      Officer Leonel Organista

Officer Leonel Organista of the Freeport Police Department testified that on May 6, 2021, he was working the morning shift as a patrol officer and a field training officer. He responded to a report of a couple fighting, a "disturbance." In all, four police officers and an officer trainee responded to the call.

When he arrived, Officer Organista saw Miller "with a bloody lip and swollen face like in her lip area." The jury was shown the bodycam video of Officer Organista's interview with Damian.[8] Another officer pulled a pocketknife out from Damian's pocket and Damian said the knife belonged to him. Officer Organista took the knife, which he believed to be a "deadly weapon," to the Freeport Police Department.

---

[7]      The letters are discussed in more detail below.

[8]      Based on Officer Organista's interview with Damian, he understood Miller was also a resident of the house at 16 North Avenue B.

According to Officer Organista, Damian told him he ran from Miller because she was trying to assault him. Officer Organista testified he did not believe Miller had assaulted Damian, who did not appear to be injured. Officer Organista said the evidence gathered at the scene "was [consistent] to [Miller's] story of what had happened inside [the] residence."

Officer Organista testified that Damian was intoxicated when they spoke at the house. At the police station, Damian was placed in a detox cell, where he was "actively kicking the door or doing something to the metal . . . detox cell door." Because he continued to kick the door, he was put in a "wrap," which "doesn't allow him to move." The purpose of the wrap is for the prisoner's safety, "you know, him punching the door so many times or kicking it could potentially – he could harm himself. So we took that decision to put the wrap on him."

## C. Sergeant John Perez

Sergeant John Perez, a Freeport Police Department patrol officer, was the lead officer in the case. Sergeant Perez's bodycam video of his interview with Miller was played for the jury.

Sergeant Perez testified that when they arrived at 16 North Avenue B, they met Miller, who told him "she was involved with a disturbance with a – her boyfriend. They were together for eight months." Miller told Sergeant Perez that she and Damian "were involved in an argument because she was being accused of

cheating." According to Sergeant Perez, Miller said Damian assaulted her with a closed fist and pointed a knife at her. She told Sergeant Perez that Damian told her he was "going to cut [her] throat" and the throat of the person with whom she was allegedly cheating.

Sergeant Perez told the other officers to arrest Damian. He did so "[b]ecause there were visible injuries to Ms. Miller" and she told him that Damian assaulted her. Miller's clothes were strewn on the staircase, which was consistent with Miller's statement that Damian had thrown her clothes all over the stairs. Miller told Sergeant Perez that Damian displayed a knife, which the police recovered from Damian's pocket.

Sergeant Perez testified that based on the evidence collected at the scene, the witnesses' statements, and his observation that day, he believes Damian intentionally or knowingly threatened Miller with imminent bodily injury and exhibited a deadly weapon.

## D. Gilbert Damian

Gilbert Damian stated during opening arguments that he did not know Miller. He stated, "I don't even know this girl. She was brought to me. She was homeless." He stated he did nothing and that he "never displayed a knife to her. I was working."

8

During his testimony, Damian claimed that Miller, and not the police, had taken the photos of Miller admitted into evidence, which according to Damian, reflected "injuries that she's had awhile back."[9] "Them officers didn't take them photos. Believe me. I recognize them photos from way back." He testified that Miller provided the photos of the injuries from her phone, and that she cut her hand on the window.

Damian testified he had known Miller for "about a year." He testified, "There is absolutely no way that I have committed these crimes that this girl or this prosecution is bringing against me." He stated, "I don't do stuff like assault women."

He testified that Miller had assaulted him four or five times and that he tried unsuccessfully to file charges against her. Damian stated that Miller "gave [him] a concussion. [He] had to go to the hospital and take – give hospital records. They still wouldn't file charges on her." He continued:

> See, this girl is always assaulting. She's very assaultive. She's a crack head. She smokes a lot of crack when I'm at work, when I'm gone. . . . She had a guy with a gun there that was ready to use that gun with me. She's a prostitute. She's probably – I think she practices witchcraft, what it is.

Damian testified that he spent a collective thirty-five years in the Texas Department of Corrections. He committed criminal mischief in 1975 and upon

---

[9]     Sergeant Perez's bodycam footage shows an officer taking photos of Miller's injuries.

release, his probation for criminal mischief was revoked after he "allegedly hit somebody with a car." In 1982, he was charged with aggravated assault, when an Angleton police officer claimed Damian "tried to stick him with a knife."[10] Damian testified he did not point a knife at anyone, but rather, he dropped it. According to Damian, while he was in TDC serving a sentence for aggravated assault against a peace officer, he was convicted of aggravated assault of a correctional officer.

Six letters written by Damian to Miller were admitted into evidence and excerpts were read to the jury. One of the letters said, "Baby girl, I still love you. I really do. And you must search your heart to fully comprehend this event." This was admitted as State's Exhibit 14. The letter continued, "I am not filing charges on you like you've been told. I gave you permission to use my cards. I even wrote bank telling them I gave you permission, okay, use my cards, okay, and with pin number."

In State's Exhibit 9, another letter, Damian asks Miller "to go to the courthouse and file a non-prosecution affidavit." The letter offered her $500 to sign the affidavit. The letter continues, "There is no way I was ever filing charges on you. Unauthorized use of bank cards. I released them to you with pin number plus your food stamps." In another letter, State's Exhibit 10, Damian writes, "I do

---

[10] He subsequently said the officer "claimed [Damian] hit him with [his] fan."

not know what made you – what made me throw some of your clothes downstairs. Also about the kids."[11]  Another letter, State's Exhibit 11, says:

> I am requesting to talk to an investigator that will help me file charges against you.  And you will be arrested and locked up like you have done me.  You have never appreciated absolutely nothing I have done for you.  All you have done for me is to take advantage of me, no matter how much I've done for you or what I've done for you.  I have done more for you than I have ever done for any other girl I have ever had in my life.

It continues, "I will not file charges on you if you go to the courthouse and file a non-prosecution affidavit."  Another letter, State's Exhibit 12, says, "You never called police so why did you call police on me May 6th 2021?"  The letter continues, "I need you to go to courthouse, file another non-prosecution affidavit, sweetheart.  Please go do this, Yvette.  Okay?  You never filed charges because it's impossible I threaten you with a knife."  State's Exhibit 12 continues:

> I was mad because you had Ernest in my place I am renting from you – him, drinking my liquor, messing with you.  That's showing me no respect in my place.  I should have never thrown some of your clothes down the stairs, but I was also made because you always kept windows open, subject dogs falling out the window.

Finally, the letter states, "Yvette.  Okay.  They have to drop charges.  Okay?  And if – and as it is, because you never filed charges and you [sic] under no obligation to show up at a trial.  They cannot make you show up to trial."

---

[11]  Damian testified that "the kids" are Miller's dogs.

The jury convicted Damian, made affirmative findings on three enhancement paragraphs,[12] and sentenced him to thirty years' confinement in the Institutional Division of the Texas Department of Criminal Justice.

This appeal ensued.

## Standard of Review and Applicable Law

We apply the sufficiency standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979) in determining whether the evidence is sufficient to support each element of a criminal offense that the State must prove beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). In evaluating the sufficiency of the evidence, we defer to the factfinder's credibility and weight determinations. *Id.* at 894. "[W]e view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 895)). We consider both direct and circumstantial evidence in our analysis. *Laster v. State*, 275 S.W.3d 512, 517–18 (Tex. Crim. App. 2009); *see Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010)

---

[12] The enhancement paragraphs state that on November 14, 1978, Damian was convicted of the felony offense of Criminal Mischief-Damage and Destroy; on August 20, 1984, Damian was convicted of the felony offense of Aggravated Assault-Enhanced; and on December 11, 1987, he was convicted of the felony offense of Aggravated Assault on a Peace Officer-Habitual.

("Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "the standard of review on appeal is the same for both direct and circumstantial evidence cases.") (quoting *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).

This sufficiency standard does not blindly defer to the factfinder's credibility determinations, as "it allows for some consideration of whether the jury's credibility determinations were rational in light of the objective evidence." *Walker v. State*, Nos. PD-1429-14, PD-1430-14, 2016 WL 6092523, at \*15 (Tex. Crim. App. Oct. 19, 2016) (not designated for publication) (citing *Brooks*, 323 S.W.3d at 907). We must presume the finder of fact resolved any evidentiary conflicts in favor of the verdict and defer to that resolution. *See Jackson*, 443 U.S. at 326; *see also Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (observing that reviewing court's role on appeal "is restricted to guarding against the rare occurrence when a fact finder does not act rationally") (quoting *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010)). If our review reveals the evidence is insufficient, we must reverse the appellant's conviction. *Costilla v. State*, 650 S.W.3d 201, 212 (Tex. App.—Houston [1st Dist.] 2021, no pet.). However, if there are two permissible views of the evidence, "the fact finder's choice between them cannot be clearly erroneous." *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006).

A person commits an assault if he "intentionally or knowingly threatens another with imminent bodily injury[.]" TEX. PENAL CODE § 22.01(a)(2). An assault is enhanced to "aggravated assault" if the actor "uses or exhibits a deadly weapon during the commission of the assault." *Id.* § 22.02(a)(2). "Deadly weapon" is defined as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17)(B). And "serious bodily injury" is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46).

**Analysis**

In his single issue, Damian argues the evidence is insufficient to support his conviction for aggravated assault. He argues the State failed to establish he had the requisite *mens rea* for the offense and that he threatened to harm Miller with a deadly weapon because his pocketknife was not a deadly weapon—a requisite element of the charged offense.

**A.    *Mens Rea***

A person commits an assault if he "intentionally or knowingly threatens another with imminent bodily injury[.]" TEX. PENAL CODE § 22.01(a)(2). In his brief, Damian quotes pages of testimony from the trial but he does not explain the relevance of the testimony to any purported argument regarding the "imminent

14

threat" or "intentional or knowing" requirements of the charged offense. He cites no authorities, and he does not include any record cites to support his argument that the State failed to establish he had the requisite *mens rea* for the charged offense. Having failed to provide analysis or authorities regarding his *mens rea* argument, Damian waived his issue on appeal. *See* TEX. R. APP. P. 38.1(i) (stating appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005) (overruling points of error as "inadequately briefed" when appellant did not provide argument or authority regarding purported error).

## B. Deadly Weapon

An assault is enhanced to "aggravated assault" if the actor "uses or exhibits a deadly weapon during the commission of the assault." TEX. PENAL CODE § 22.02(a)(2). To sustain a deadly weapon finding, the deadly weapon must meet the statutory definition, and the evidence must show that (1) the defendant used or exhibited the deadly weapon while committing the crime at issue, and (2) others were "actually endangered." *Cates v. State*, 102 S.W.3d 735, 738 (Tex. Crim. App. 2003); *Callison v. State*, 218 S.W.3d 822, 826 (Tex. App.—Beaumont 2007, no pet.).

Even though a knife is not a deadly weapon per se, "it can be a deadly weapon if the person using it intends to use it in a way in which it would be capable of causing death or serious bodily injury." *Magana v. State*, 230 S.W.3d 411, 414 (Tex. App.—San Antonio 2007, pet. ref'd) (holding evidence supported finding pocketknife was deadly weapon) (citing *Williams v. State*, 575 S.W.2d 30, 32 (Tex. Crim. App. 1979)); *see also Clark v. State*, 444 S.W.3d 671, 678 (Tex. App. —Houston [14th Dist.] 2014, pet. ref'd) (holding pocketknife was deadly weapon). It is not necessary that wounds be inflicted "before a knife can be determined to be a deadly weapon." *Denham v. State*, 574 S.W.2d 129, 130 (Tex. Crim. App. 1978); *Dominique v. State*, 598 S.W.2d 285, 286 (Tex. Crim. App. 1980) (noting "wounds are not a necessary prerequisite for an object to be a deadly weapon"). "When no actual injury is sustained by the [complainant], the prosecution must introduce evidence of other factors to establish that the knife is a deadly weapon." *Magana*, 230 S.W.3d at 414.

It is the jury's province "to determine whether an individual used a knife as a deadly weapon by weighing the evidence before it on a case-by-case basis and using that evidence to draw reasonable inferences." *Sauls v. State*, No. 14-17-00239-CR, 2019 WL 2535995, at *4 (Tex. App.—Houston [14th Dist.] June 20, 2019, no pet.) (mem. op., not designated for publication) (citing *Isassi*, 330 S.W.3d at 638). "The jury is free to consider all of the facts of the case, including any

16

actual wounds inflicted or words spoken by the appellant, in deciding if the weapon is deadly." *Williams v. State*, 575 S.W.2d 30, 32 (Tex. Crim. App. 1979).

"[O]bjects used to threaten deadly force are in fact deadly weapons." *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000). The plain language of Section 1.07(a)(17)(B), which defines deadly weapon, "does not require that the actor actually intend death or serious bodily injury." *Id.* "[A]n object is a deadly weapon if the actor intends a use of the object in which it would be capable of causing death or serious bodily injury." *Id.* To determine whether an instrument is a deadly weapon, courts consider "words and other threatening actions by the defendant," including "the defendant's proximity to the victim; the weapon's ability to inflict serious bodily injury or death, including the size, shape, and sharpness of the weapon; and the manner in which the defendant used the weapon." *Johnson v. State*, 509 S.W.3d 320, 323 (Tex. Crim. App. 2017). While these are factors to consider, they are not "inexorable commands." *Id.*

Damian argues the evidence was insufficient to establish his pocketknife was a deadly weapon. We disagree.

The knife was admitted into evidence. In addition, the jury heard evidence that Damian spat on Miller's face, hit her, kicked her, pulled her arm, and punched her, breaking her tooth. Miller testified that Damian was getting progressively "out of control," and she was "scared." She testified that Damian pulled the knife

17

from his pocket, opened it, and pointed it at her while threatening to "cut her" and the landlord. The jury also heard Officer Organista and Sergeant Perez testify that the knife was a deadly weapon. The jury thus heard evidence that Damian "used or exhibited" the knife while threatening "to cut" Miller and that he came within inches of her. Based on the testimony from Miller, Officer Organista, and Sergeant Perez, the jury could have concluded Miller was "actually endangered" by Damian's wielding of the knife. *See Cates*, 102 S.W.3d at 738.

Relying on *Banargent v. State*, 228 S.W.3d 393 (Tex. App.—Houston [14th Dist.] 2007, pet ref'd), Damian argues that the knife was not a deadly weapon because (1) there was no evidence "to show the size, shape, and sharpness of the knife; other than a pocket knife;" (2) there was no evidence about "the manner in which [Damian] used the weapon; such as pointed it, but nothing about how far or distance from [Miller];" (3) there were no wounds inflicted by the knife; (4) there was no evidence regarding the knife's life-threatening capabilities; and (5) because of Damian's statements.

In *Banargent*, a jury convicted the appellant of aggravated assault and found he used a deadly weapon—a knife— during the assault. *Id.* at 395. On appeal, the court held that there was sufficient evidence the appellant used a knife, the knife was a "deadly weapon," and appellant inflicted "serious bodily injury." *Id.* at 398–400.

Damian's reliance on *Banargent* is misplaced for two reasons. First, the indictment and the application paragraph of the charge in *Banargent* indicated the appellant committed the aggravated assault by causing serious bodily injury to the complainant by stabbing her and appellant "appear[ed] to direct his legal sufficiency challenge to the evidence [] he used a knife, not to evidence that the weapon he used was a deadly weapon[.]" *Id.* at 398. Second, while the *Banargent* factors may be considered to determine whether a defendant used or exhibited a deadly weapon, they are neither definitive nor exclusive. As we explained in *Schnizer v. State*, while the *Banargent* factors "*may* be considered in determining whether a particular knife qualifies as a deadly weapon," the jury may also consider other factors, including "words and other threatening actions by the defendant" and the "defendant's proximity" to the complainant. No. 01-20-00194-CR, 2021 WL 4953917, at *8 (Tex. App.—Houston [1st Dist.] Oct. 26, 2021, pet. ref'd) (mem. op., not designated for publication) (emphasis added); *see also Sauls*, 2019 WL 2535995, at *4 (noting *Banargent* factors "*can* be considered in determining whether a particular knife qualifies as a deadly weapon.") (emphasis added). Ultimately, it "is for the jury to determine whether an individual used a knife as a deadly weapon by weighing the evidence before it on a case-by-case basis and using that evidence to draw reasonable inferences." *Id.*

In any event, Damian is incorrect in asserting there was no evidence presented as to any of the five *Banargent* factors  The knife was admitted into evidence.  The jury was thus able to determine its size, shape, and sharpness. Miller also testified that Damian pointed the knife at her, and the bodycam footage confirms she told the police Damian pointed the knife at her.  Although there was no testimony that Miller was injured by the knife, such testimony was not required because the indictment alleged Damian threatened Miller with the knife.  Officer Organista and Sergeant Perez also testified that the knife was a deadly weapon. And Miller testified that when Damian took the knife out of his pocket, he opened it and told her he was going to "cut" her and the landlord.  There was thus evidence concerning all five of the *Banargent* factors.

We find the opinion in *Rucker v. State*, No. 03-19-00493-CR, 2021 WL 501113 (Tex. App.—Austin Feb. 11, 2021, no pet.) (mem. op., not designated for publication) instructive.  In *Rucker*, the appellant was convicted of aggravated assault with a deadly weapon—"intentionally or knowingly threatening [the complainant] with imminent bodily injury and using a deadly weapon during the commission of the offense." *Id.* at *1.  The complainant testified that Rucker was holding a pocketknife and said he was going to "cut" her if she came onto his

property.[13]  *Id.*  She estimated that Rucker was approximately thirty feet away from her when he threatened her.  *Id.*  She testified that Rucker "said he was going to cut me because we keep bothering him and messing with his home."  *Id.* at *2.

Rucker challenged the sufficiency of the evidence to support his conviction. *Id.* at *9.  He argued the knife was not capable of causing death or bodily injury because he was thirty feet from the complainant when he threatened her; she was not injured; he only threatened to "cut" her, "which may or may not cause serious bodily injury;" the pocketknife only had a three-inch blade and was not designed to be a weapon; and Rucker did not "make any slashing, stabbing, or swiping motions with the knife" that would suggest he intended to cause the complainant serious bodily injury.  *Id.* at *11.

The court held that, viewing the evidence in the light most favorable to the verdict, the evidence showed Rucker was moving toward the complainant while holding a knife, which according to an officer's testimony, was capable of "cutting and stabbing."  *Id.*  The knife was admitted into evidence, allowing the jury to assess its characteristics.  *Id.*  The jury heard testimony that Rucker was "angry, yelling, and cussing" as he approached the complainant and that he threatened to

---

[13]     The property was a grassy area near a Jiffy Lube where the complainant worked. *Rucker v. State*, No. 03-19-00493-CR, 2021 WL 501113, *1 (Tex. App.—Austin Feb. 11, 2021, no pet.) (mem. op., not designated for publication).  The complainant testified Rucker was a transient man she had seen around the Jiffy Lube on several occasions. *Id.*

21

"cut" her. *Id.* The complainant testified that Rucker held the knife toward her as if he was going to stab her with it. *Id.* The court concluded that, based on the totality of the circumstances, including the knife's physical characteristics, Rucker's words and actions during the encounter, the manner in which he held the knife as he approached the complainant, and her reaction to the threat, the jury could reasonably have inferred Rucker used the knife in a way such that it could cause the complainant serious bodily injury or death and, therefore, it was a deadly weapon during the commission of the crime. *Id.*

As in *Rucker*, we similarly conclude the evidence established Damian was approaching Miller while holding a knife that according to two officers was a deadly weapon. The knife was admitted into evidence, allowing the jury to assess its size, shape, and other characteristics. The jury heard testimony that Damian was angry, yelling at Miller, calling her names, spitting in her face, punching her in the face, pulling her arm, and kicking her leg. And Miller testified that Damian, standing inches away from her, pointed the knife at her and told her "he was going to cut" her.

Based on this evidence, the jury reasonably could have inferred that Damian used the knife in a such a way that it could have caused Miller serious bodily injury or death and, thus, it was a deadly weapon during the commission of the

crime. Viewing the evidence in the light most favorable to the verdict, as we must, we hold the evidence is sufficient to sustain the jury's "deadly weapon" finding.

We overrule Damian's sole issue.

## Conclusion

We affirm the trial court's judgment.


Veronica Rivas-Molloy
Justice


Panel consists of Chief Justice Adams and Justices Landau and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).